Chris **CHENGELIS** et al., Plaintiffs,

v.

**CENCO INSTRUMENTS CORPORA-TION**, Defendant.

Civ. A. No. 71–1201.

United States District Court,
W. D. Pennsylvania.

Jan. 6, 1975.

James D. Morton and T. L. Van Kirk, Pittsburgh, Pa., for plaintiffs.

Frank J. Lucchino, Pittsburgh, Pa., Walsh, Case & Coale, Chicago, Ill., for defendant.

## OPINION

WEBER, District Judge.

This civil action for damages is based on a contract entered into in 1966 by plaintiffs and Joseph M. Lasher with a wholly-owned subsidiary of the defend-ant named Chemlime Corporation (Chemlime).

Plaintiffs are four brothers, all citizens of the State of Ohio. The defendant is incorporated in the State of Delaware and maintains its principal place of business in Illinois. The amount in controversy exceeds $10,000 and the court has jurisdiction under 28 U.S.C. § 1332.

A non-jury trial has been held in the matter, the parties have submitted a pretrial stipulation, trial and post-trial briefs and proposed findings. The stipulated facts include the following which are relevant to our determination of this matter.

Plaintiffs, together with a now deceased brother and Joseph M. Lasher, owned all of the shares of Ohio Industrial Wastes (OIW). OIW had been formed in 1963 to engage in the business of neutralizing and disposing of industrial waste in the area owned around Lisbon, Ohio. Prior to its 1966 agreement with Chemlime, OIW had not engaged in or transacted such business but it had procured from an agency of the State of Ohio a permit authorizing it to discharge industrial wastes into a drainage basin near Lisbon, Ohio.

Defendant Cenco Instruments Corporation (Cenco) together with its subsidiaries engages in business in several areas, one of which is "pollution abatement." In September 1965 Cenco entered into a merger with another corporation. As a result of this merger Cenco, the surviving company, acquired Chemlime as its wholly-owned subsidiary corporation. At the time of the merger Chemlime manufactured and sold lime in various sections of the United States and operated a plant for the neutralization of industrial wastes in Reading, Pennsylvania.

In the spring of 1966 Plaintiffs and Mr. Lasher began to negotiate with Chemlime Corporation for the sale of its OIW stock and facilities. During the negotiations Chemlime was represented by its Vice-President and General Manager, James J. Fitzpatrick.

The negotiations ultimately resulted in three agreements, two of which were dated August 11, 1966 and one of which was dated August 12, 1966. Pursuant to the stock sale agreement of August 11, Chemlime became the owner of all the OIW stock. Under the property sale agreement of August 11, Chemlime purchased the OIW facilities comprising about 226 acres of Lisbon area land including certain disposal pits or "cuts". Under the August 12, 1966 contract Chemlime agreed to pay to plaintiffs a royalty on each gallon of waste material disposed of by Chemlime within a 200 mile radius of Lisbon, Ohio. The royalty contract provided that such payments were to continue until either (1) the "cuts" on the 226 acre tract were filled or (2) ten years time had elapsed, whichever was later. Within the 200 mile radius only two specifically stated areas, both sites of previously existing Chemlime facilities, were exempted from the operation of the royalty payment provisions.

All three agreements were executed on behalf of Chemlime by Ralph C. Read, its President and Chairman of its Board of Directors. During the negotiations and at the time of the execution of the agreements, Read was also President and a Director of Cenco. Fitzpatrick was not at such times an officer, director or employee of Cenco.

Subsequent to the execution of the three agreements but prior to the institution of this suit, Mr. Lasher's interest in the royalty agreement was purchased by plaintiff Chris Chengelis and James P. Chengelis.

On February 28, 1969 Cenco acquired the assets of Industrial Wastes, Inc. (Industrial) and Limco, Inc. (Limco), two Beaver County, Pennsylvania corporations, by means of an exchange of stock and a corporate reorganization.

Prior to the acquisition by Cenco, Industrial was engaged in the neutralization and disposal of industrial wastes and Limco was engaged in the sale of lime. Industrial had property including dumping pits in Beaver County and Washington County, Pennsylvania. Limco had handling and storage facilities in Beaver County. Since the acquisition the Industrial and Limco facilities have been operated as a division of Cenco. This division has engaged in the disposal of industrial wastes within the proscribed 200 miles of Lisbon but neither Chemlime nor Cenco has paid any royalties to plaintiff on such wastes. There is no dispute that the time recited in the royalty agreement has not yet passed, that the "cuts" in the Ohio property are not yet full, and that the Industrial and Limco facilities do not lie in either of the two locales specially exempted in the royalty agreement.

We find from the evidence the following facts:

While Chemlime had for over twenty years engaged in the industrial waste business throughout the United States, it had no waste facilities in Western Pennsylvania or Ohio prior to its acquisition of the OIW facilities in 1966.

Prior to 1969 Cenco was not engaged in the business of neutralization or disposal of industrial wastes, except through its subsidiary Chemlime.

In late 1968 or early 1969 Fitzpatrick, who had negotiated the contract between Chemlime and OIW contacted John Harper of Industrial and Limco to determine whether the assets of Industrial and Limco could be acquired. At the time of his initial contact with Harper, Fitzpatrick was still an officer of Chemlime but was not an officer, director or employee of Cenco. After Harper indicated a willingness to sell Industrial and Limco, Fitzpatrick, after considering the possible effects of the royalty agreement on such a sale, advised some officer or agent of Cenco that Cenco and not Chemlime should make the acquisition. Sometime after Cenco made the acquisition Fitzpatrick became a Vice-President of Cenco.

During the negotiations for the sale of the OIW stock and real estate, plaintiffs were represented by counsel. Plaintiffs knew that Chemlime was a wholly-owned subsidiary of Cenco and

that Fitzpatrick was only Chemlime's and not Cenco's employee. The three agreements do not provide, however, that defendant. Cenco in any way guarantees the obligations of Chemlime or binds itself. Indeed the name "Cenco" never appears in the contracts. Mr. Read's execution of all three agreements is clearly on behalf of Chemlime; no recital of Mr. Read's connection with Cenco appears on the documents.

There is abundant evidence in the record to show a close relationship between Cenco and Chemlime. We do not reach the question of whether the evidence is sufficient to establish the "alter ego" relationship argued for by plaintiffs, however, because there is no proof that the corporate form of the subsidiary was used by the defendant to perpetrate a fraud or promote an injustice akin to fraud. Absent the element of fraud or injustice akin to fraud, we cannot disregard the corporate structure of Chemlime and impose liability on its parent, Cenco. "(A)ny court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." Zubik v. Zubik, 384 F.2d 267, 273 (3rd Cir. 1973). These circumstances arise "where the corporation . . . is used principally as an intermediary to perpetrate fraud or promote injustice." Bankers Life and Casualty Co. v. Kirtley, 338 F.2d 1006, 1013 (8th Cir. 1964). See also Whayne v. Transportation Management Service, Inc., 252 F.Supp. 573, 577 (E.D.Pa.1966); Berger v. Columbia Broadcasting System, Inc., 453 F.2d 991, 995 (5th Cir. 1972). But "(a)bsent bad faith in its formation or its use as some nefarious instrumentality, (the corporation) can stand independent and immune to the piercing operation." Maley v. Carroll, 381 F.2d 147, 153 (5th Cir. 1967).

There is no allegation in the instant case that Chemlime was acquired by Cenco with the intention of its misuse to plaintiffs' detriment. There is no proof that at the time Chemlime executed its agreements with plaintiffs Cenco concealed its relationship with Chemlime or used its control over Chemlime to defraud or deceive plaintiffs. There is no evidence that Cenco had any specific corporate opportunities in mind which dictated the form of Chemlime's agreements with plaintiffs. Conversely, the evidence shows that plaintiffs executed a contract which bound only the subsidiary and not the parent corporation notwithstanding plaintiffs' knowledge of the interrelation of the two. We can find no obligation of Cenco toward these plaintiffs to provide for the subsequent acquisition of Limco and Industrial in such a way as to insure plaintiffs' receipt of royalty payments under their agreement with Chemlime.

Where, as here, the parties deal at arm's length, represented by counsel, "(t)he 'corporate veil' cannot be removed merely to give a litigant an advantage at law." Wooddale, Inc. v. Fidelity and Deposit Co. of Maryland, 378 F.2d 627, 631 (8th Cir. 1967). "A hard bargain is not enough to energize the equitable power to disregard the corporate form." *Maley,* cite supra, 381 F.2d at 154. A party which knowingly limits its contractual relationship to one of two or more related corporate enterprises cannot successfully attack the validity of the entity with which it dealt without proof of misrepresentation or other unusual circumstances justifying the application of an estoppel. Brown v. Gloeckner, 383 Pa. 318 118 A. 2d 449, 451 (1955); Plumbers and Fitters Local 761 v. Matt J. Zaich Construction Co., 418 F.2d 1054 (9th Cir. 1969).

The only allegation of plaintiffs which might be relevant to requirements of *Brown* and *Plumbers* is recited in their proposed finding of fact No. 15; "During the negotiations, Fitzpatrick assured plaintiffs that . . . they did not have to be concerned about Cenco or Chemlime building another plant within the 200-mile radius." Even if we were to accept that Fitzpatrick made such a statement there was no attempt to incorporate such a provision

in the final contract, and we do not believe that such a statement would be sufficient to allow this court to pierce Chemlime's veil. Cenco never did build a plant within the proscribed area; it only acquired existing operating facilities of an outside party. Moreover, there is no proof that, in reliance on this specific representation of Fitzpatrick, plaintiffs declined to insist on Cenco's participation in their agreement with Chemlime.

Plaintiffs also suggest that liability can be imposed on Cenco under the "theory of enterprise unity" or under an unprecedented unnamed tort, the elements of which are not recited. We find in plaintiffs' briefs neither case law nor public policy argument compelling enough to justify such an expansion of remedies under contract of tort law.

## ORDER

■ This action having been tried by the court without a jury and the court having reached the aforesaid findings of fact and conclusions of law, it is hereby ordered that judgment be, and the same is, entered in favor of Defendant and against Plaintiffs.